NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

FLEX PLASTICS, INC., Respondent.

No. 82–1882.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 7, 1983.

Decided Jan. 20, 1984.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., John P. Coyle (argued), Washington, D.C., for petitioner.

Rayford T. Blankenship, Loren J. Comstock (argued), Abbott, Comstock & Goerges, Indianapolis, Ind., for respondent.

Before LIVELY, Chief Judge, JONES, Circuit Judge, and CELEBREZZE, Senior Circuit Judge.

PER CURIAM.

This case is presently before the Court upon the National Labor Relations Board's (the Board's) petition for enforcement of its order finding that Flex Plastics, Inc. (the Company) (1) violated § 8(a)(5) and (1) of the NLRA by withdrawing recognition from and refusing to bargain with the Union, (2) violated § 8(a)(1) by conditioning employee Virbel Swihart's continued employment on her refraining from Union activity, and (3) violated §§ 8(a)(1), (2) and (5) by misleading its employees. The Company refutes these findings and contends that the Board's order directing it to recognize and bargain with the Union is an improper exercise of its remedial authority. Upon consideration of the issues presented by this appeal, we affirm the Board's findings and enforce its order.

The Company is an Ohio corporation primarily engaged in the manufacture of plastic products for the automotive industry. The record before us reveals that in May of 1977, Local 662 became the exclusive bargaining representative of the Company's production and maintenance employees. The Company and the Union entered a collective bargaining agreement which covered the period from May 4, 1977 until May 3, 1980. In February, 1980, the Union gave notice of its intent to terminate that agreement and negotiate a new contract. In negotiations, the parties were able to agree on many issues, but reached what the Company feels to be an impasse on several other issues. On June 23, 1980, the parties requested a representative of the Federal Mediation and Conciliation Service to aid them in the negotiations. A breakdown occurred, however, with the understanding that the talks would be continued when the parties were ready. On July 8, the Company informed the Union that it would implement most of the contract proposals. The Union did not object.

During the negotiations, about seven of the Company's employees engaged in a brief strike. After the strike, the Union filed unfair labor practice charges against the Company, claiming that the Company had violated §§ 8(a)(1) and (3) of the NLRA.

On July 17, 1980, employee, Mary Comignaghi filed a petition, seeking a decertification election to determine whether the Company's employees still wanted the Union to represent them. On July 28, 1980, the Company filed a petition seeking a determination of the Union's continued majority support. In August, the Company's Plant Superintendent, Charlie Prince, suggested that the employees form a committee to discuss their complaints with him. Employees Diane Shaffer, Don Moore, Comignaghi and Joseph Hern formed a committee and sought the support of other employees. These employees then notified Company president Burket that they wished to be recognized as the employees' bargaining representatives. Burket and the Company's labor relations advisor, Blankenship, informed the committee that they could not be recognized as the bargaining representatives without majority support. Burket wrote the Union of the Company's position:

> we can no longer give credence to the expired Union Contract; nor can we continue to recognize your union as a majority representative . . .

> Therefore, please be advised that effective immediately . . . we will no longer deduct Union Dues or Initiation fees pursuant to the expired contract.

In September, 1980, 25 employees signed a statement of support for Local Union 662. In October, the Company reopened its No. 2 plant and hired 20 employees. In hiring these employees, the Company did not follow the seniority and recall provisions established in § 17 of the old contract. The Company neither notified the Union of its intent to reopen the plant nor offered to bargain with the Union over the reopening.

On October 27, 1980, Burket called a meeting in Plant No. 2 of all of the Company's employees. Burket opened the meet-

ing by introducing Blankenship as "the best" labor lawyer and told the employees that Blankenship would truthfully explain "to you everything that's going on from the word one." Blankenship outlined the history of the Company's relationship with Union Local 662. He stated that the Company had informed Local 662 that it no longer represented the employees and claimed that the Local through a "disclaimer by silence" had indicated its unwillingness to represent the employees. Blankenship then referred to the Committee:

> the Company had been dealing with you on an employee type group action since that time because the Company did not leave you out on your own with a feeling that you are unprotected . . . The Company will continue to do it. There is nothing wrong with that, nothing illegal.

Blankenship also stated that the employees were no longer joining Local 662; they had

> been operating as employees . . . under Section 7 of the Taft-Hartley Act. Section 7 . . . gives you protection as employees. . . . It protects concerted activity and union activity. Section 7 of that Federal Law doesn't protect necessarily only union activity. It protects you also for concerted activity.

Blankenship further assured the employees that as employees, they had the right under § 7 to do their own bargaining as a type of "concerted activity" and that, "if the Company did anything to harm your rights or to interfere in your concerted rights under the Federal law, all you have to do is pick up the phone."

On October 30, Union president, Calhoun wrote Burket concerning the employees' rights with regard to the reopened Plant 2. Company vice-president Corbett replied that the Company would do nothing before arbitration was established. On November 7, Calhoun again wrote Burket requesting a meeting on contract negotiations. On November 17, Blankenship wrote Calhoun expressing the Company's insistence that any meeting include a federal mediator and its "shock" at the Union's desire to negotiate the Plant 2 openings.

In early December, 1980, the employees formed a new "Flex Shop Committee." On January 7, 1981, the committee members posted a petition on the bulletin board of Plant No. 1 which was signed by 17 of the Company's 26 Plant No. 1 employees. The petition authorized the committee to bargain on behalf of the employees for wages, hours, and working conditions. On January 9, 1981, Burket verified the employees' signatures and recognized the Flex Shop Committee as the employees' bargaining representative.

The Shop Committee negotiated a three year agreement which provided for an increase in wages and benefits. On January 22, 1981, the agreement was ratified and implemented. On January 20, 1981, the certification election was finally held. The Shop Committee received 13 votes, while the Union received 11 votes. Eight votes were challenged and the Union filed objections to the election. The Regional Director, after an investigation, sustained 5 of the challenges and ordered that the resolution of the other 3 should await the adjudication of the unfair labor practice issues.

Confronted with these issues, Administrative Law Judge Miller found and the Board agreed that the Company violated §§ 8(a)(5) and (1) by withdrawing recognition of the Union and refusing to bargain with it over the Plant 2 openings; violated § 8(a)(1) by conditioning employee Swihart's employment upon her refraining from union activity; and violated §§ 8(a)(1), (2) and (5) by undermining the Union's majority status. We find substantial evidence on the record as a whole to support each of these findings. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951).

I.

§§ 8(a)(5) and (1):

Withdrawing recognition and refusing to bargain

The Company concedes that it withdrew recognition of Local 662. On appeal, however, the Company contends that

its withdrawal of recognition is not violative of the NLRA. Section 8(a)(5) of the NLRA grants to the Union an irrebuttable presumption of majority status for one year following its certification. *NLRB v. Pennco, Inc.,* 684 F.2d 340 (6th Cir.), *cert. denied,* 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982). After one year, the presumption of majority status becomes rebuttable. *Pennco* 684 F.2d at 342. The Company carries the burden of rebutting the presumption of majority status. In order to carry its burden, the Company must demonstrate that majority status is no longer valid or that its agents have a bona fide belief that the union no longer has the support of a majority of employees. *Pennco,* 684 F.2d at 342. *See also NLRB v. Triplett,* 619 F.2d 586, 587 (6th Cir.1980). This good faith belief must be supported by "objective considerations which are clear, cogent and convincing." *Id.* Subjective evidence may be used to "bolster the argument that good faith doubts of majority status exist." *Id.* The relevant date at which to consider the bona fides of the employer's doubts is the date that recognition is withdrawn. *Pennco,* 684 F.2d at 342.

In the case at bar, Local 662 was clearly entitled to a presumption of continued majority support as the incumbent representative of the employees. The Company withdrew its recognition through Burket's August 27 letter to the Union and reaffirmed its withdrawal in Blankenship's November 17 letter to the Union. Our task therefore is to determine whether the Company had a bona fide doubt of majority status at those critical dates. In its August 27 letter, the Company suggested that the unsuccessful contract negotiations and the two decertification petitions were the basis for its recognition withdrawal. In its November 17 letter, the Company stated that the "long hiatus of time" and the Union's inaction provided the basis for withdrawal.

We conclude, however, that the Board properly rejected these proffered reasons for the withdrawal of recognition. The fact of stalled contract negotiations cannot be the basis for the good faith belief that a Union has lost majority support. *NLRB v. Hondo Drilling Co.,* 525 F.2d 864 (5th Cir.), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 78 (1976). Neither does the fact of the filing of decertification petitions alone justify the belief that the Union has lost majority support. In *Walker Die Casting, Inc. v. NLRB,* 682 F.2d 592 (6th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983), we stated that "the mere filing of a decertification petition is of itself insufficient justification" for withdrawal. *Citing, Rogers Manufacturing Co. v. NLRB,* 486 F.2d 644 (6th Cir.1973), *cert. denied,* 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 288 (1974). Further, the Company cannot rely on the Union's supposed "inaction" for a bona fide basis for withdrawal. The Company had no evidence that the *Union-employee* relationship was not an active one, only that the *Union-management* relationship was inactive. The relevant factual support for the good faith belief of non-support is inaction between the employees and the Union. *Pioneer Inn Associates v. NLRB,* 578 F.2d 835 (9th Cir.1978). In *NLRB v. Washington Manor, Inc.,* 519 F.2d 750 (6th Cir.1975), this Court stated that an employer must consider the Union's inaction from all of the circumstances before entertaining good faith doubts of majority status. The Board here found that the Company's reliance upon the Union's "inaction" was not sufficiently mindful of the circumstances. We cannot say that that finding is not supported by substantial evidence.

Nor can we reverse the Board's finding that the Company had not rebutted the presumption of Union representation with sufficient objective evidence of its bona fide doubts. In *Triplett,* as the Company argues, this Court concluded that the employer had demonstrated the bona fide belief in the lack of majority support. In that case, however, the Company received notices from ⅙ of the bargaining unit that they were terminating union membership. The Company thus received tangible evidence from which to conclude that the Union had lost majority support. In the case at bar, the Company had no such tangible evi-

dence; it relied instead on inferences from facts which are not inconsistent with typical industrial relations with a Union. The case before us, therefore, is closer to *Pennco,* wherein this Court found that the employer was not justified in doubting Union representation when new employees were hired after a strike. The *Pennco,* Court while it could not determine for itself the bona fides of the employer, concluded that the Company had not met its heavy burden of showing good faith. *Pennco* 684 F.2d at 342. In the instant case, as well, the Company has not met its heavy burden of demonstrating its good faith and reasonable doubt in the Union's majority status. The Board's finding that the Union violated §§ 8(a)(1) and (5) by withdrawing recognition of and refusing to bargain with Local 662, therefore, is clearly supported by substantial evidence on the record as a whole.

## II.
### § 8(a)(1):
### Anti-Union Coercive Activity

■ The Company next refutes the Board's finding that employee Virbel Swihart was coerced against Union activity. The Board found that the Company, through its foreman Peterman, coerced Plant No. 2 employee Swihart away from Union activity by telling her that "no talk of a Union" on the job would be permitted. The Company does not dispute the legal conclusion that such remarks are violative of the NLRA because they coerced Swihart in the exercise of her § 7 rights. But the Company contends that Foreman Peterman's account of the conversation is more credible than Swihart's account.

In light of this Court's oft-stated deference for the Board's *credibility* determinations, we must reject the Company's argument. *See e.g., Local Union 948, Int'l B'rd of Electrical Workers v. NLRB,* 697 F.2d 113 (6th Cir.1982). The ALJ explicitly questioned Peterman's credibility because of several earlier testimonial inconsistencies. The Board accepted the ALJ's credibility determinations and thus took as true Swihart's testimony. We cannot say that there was no "rational basis" for the

Board's credibility findings. *See Local Union 948,* 697 F.2d at 119. We therefore affirm the Board's finding that the Company violated § 8(a)(1) by coercing Swihart in the exercise of her § 7 rights.

## III.
### §§ 8(a)(1), (2) and (5):
### Blankenship's Speech

■ The Company contends also that substantial evidence on the record as a whole does not support the Board's finding that Blankenship's speech violated §§ 8(a)(1), (2) and (5). The Company argues instead that the speech was within the ambit of "employer free speech."

The NLRB's findings with regard to that speech, however, are clearly supported by the record. The Board found that Blankenship's speech "served to undermine the employees' support for the Union and to encourage them to bargain directly" with the Company. An employer who strives to promote direct dealing between employees and an employer violates the NLRA. *See e.g., Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). The Board found that Blankenship's speech indeed promoted such direct dealing and discouraged Union affiliation. Given Blankenship's constant and calculated insistence that the employees would have the same rights without union representation as they would with such representation and his claim that they could get through to management better without a union, the Board was entirely justified in finding the speech violative of the NLRA. We conclude therefore that substantial evidence on the record as a whole supports each of the Board's findings.

## IV.
### Remedy

The Company also argues that the Board's order directing the Company to bargain with and recognize the Union is an overly broad exercise of its remedial power. In *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court established three categorical guidelines by which to determine the

propriety of a bargaining order. Applicable to these facts is Category II, which mandates the propriety of a bargaining order in

> [L]ess extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes.

395 U.S. at 614, 89 S.Ct. at 1940. *Gissel* also stated clearly that in "fashioning its remedies under the broad provisions of Section 10(c) of the Act, the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

In the case before us, the Board found that the Company's conduct fell within Category II. The Board concluded that the Company's history of practices which tended to "undermine majority strength and impede the election process" could not be "readily rectified by traditional remedies short of a bargaining order." The NLRB in this case, therefore, was well within its wide discretion under *Gissel* to impose a bargaining order. Moreover, this Circuit has explicitly sanctioned bargaining orders in circumstances where a "nexus" between an employer's unfair labor practices and the undermining of Union majority support can be inferred. *Automated Business Systems v. NLRA,* 497 F.2d 262 (6th Cir.1974). *See also Daisy's Originals v. NLRB,* 468 F.2d 493 (5th Cir.1972). The Board inferred such a "nexus" from the facts of this case. We conclude that substantial evidence supports that inference and that the Board's bargaining order was a remedial measure well within its wide discretion.

Accordingly, the Board's petition for enforcement is hereby GRANTED.