INLAND TUGS, A DIVISION OF AMERICAN COMMERCIAL BARGE LINE COMPANY, Petitioner, Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.

Seafarers International Union of North America, Atlantic, Gulf, Lakes & Inland Waters District, AFL–CIO, Intervenor.

Nos. 89–3395, 89–3688.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1990.

Decided Nov. 26, 1990.

Rehearing and Rehearing En Banc Denied Jan. 7, 1991.

Carol L. VanHal, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., David W. Miller, Baker & Daniels, Indianapolis, Ind., Vance D. Miller, Lashly, Baer & Hamel, St. Louis, Mo., for petitioner, cross-respondent.

Aileen A. Armstrong, Howard E. Perlstein, Joseph H. Bornong, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., William T. Little, N.L.R.B., Indianapolis, Ind., for respondent, cross-petitioner.

Irwin H. Cutler, Jr., David W. Hupp, Segal, Isenberg, Sales, Stewart & Cutler, Louisville, Ky., William T. Little, N.L.R.B., Indianapolis, Ind., Emil C. Farkas, N.L.R.B., Cincinnati, Ohio, for intervenor.

Before BAUER, Chief Judge,
COFFEY, Circuit Judge, and SNEED, Senior Circuit Judge.[*]

BAUER, Chief Judge.

We consider here one of a number of related unfair labor practice charges filed by the Seafarers International Union of North America, Atlantic, Gulf, Lakes & Inland Waters District, AFL–CIO ("S.I.U.") against a group of barge lines, commercial terminal companies and dock companies. In the order at issue here, the National Labor Relations Board ("N.L.R.B." or "Board") held that the Inland Tugs Division of the American Commercial Barge Line Company ("I.T.") had violated its duty to bargain by dealing directly with its employees concerning its method of paying wages and by altering its travel policy without consulting S.I.U. Thus, the Board held that I.T. had violated sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1) & (5). (The Board's order is reported at 296 N.L.R.B. No. 124 (Sept. 29, 1989), and will hereinafter be referred to as *"Board Decision."*) The Board specifically rejected I.T.'s defense that, by demanding that the bargaining unit be expanded and that I.T. continue contributing to certain trust funds, S.I.U. had relieved I.T. of its duty to bargain by unlawfully insisting to impasse, and/or had engaged in bad faith negotiations. *See Board Decision* at 2–4. I.T. has filed a timely petition for review of this Board decision, the Board has cross-petitioned for enforcement of its order, and S.I.U. has intervened in support of the Board's order. For the reasons discussed below, both petitions are granted in part and denied in part.

**I**

**A. Background**

I.T. transports commodities by barge on the inland rivers of the United States. Since the 1960s, certain of I.T.'s employees have been represented by S.I.U. or its predecessors. These employees fell into two units: the "licensed unit" (chief and assistant engineers) and the "unlicensed unit" (deckhands, cooks, trainee engineers and tankermen). Historically, I.T. had separate bargaining agreements with S.I.U. covering these two units. The last of such agreements expired on December 30, 1979.

Changes in I.T.'s corporate structure, among other factors, have complicated the negotiation of successor agreements. Before 1980, I.T. was among several barge and towing companies that were affiliated with American Commercial Barge Line Company ("ACBL Co."). Each of the various ACBL Co.-affiliated companies had separate bargaining agreements with S.I.U., one agreement for each unit (licensed and unlicensed) within the individual company. (ACBL Co. itself has never had a bargaining agreement with S.I.U.) In 1980, several of these companies were merged into I.T. In 1987, all pretense was dropped: the "merged" I.T. lost its separate corporate status and became a division of ACBL Co. In a related development, in 1979 ACBL Co. purchased MAC Towing Inc. ("MAC"), a separate towing company similar to I.T.,

---

[*] The Hon. Joseph T. Sneed, of the United States Court of Appeals for the Ninth Circuit, is sitting by designation.

which had its own bargaining agreement with a union unaffiliated with S.I.U.[1]

From September, 1979 through April, 1980, representatives from I.T. and the other ACBL Co.-affiliated towing companies met with S.I.U. representatives to negotiate successor bargaining agreements. For various reasons that have been fully discussed elsewhere, *see ACL I,* ALJ Decision at 83–131, these negotiations proved unfruitful. *See also id.,* slip op. at 50 ("[A]fter more than 10 bargaining sessions, progress was imperceptible on several critical issues.") No successor agreement between S.I.U. and I.T. (or any of the other ACBL Co.-affiliated companies or divisions) has yet been reached.

Despite the lack of an agreement, I.T. has periodically notified S.I.U. of changes in wages and certain working conditions, and offered to bargain concerning these issues. From 1980–84, S.I.U. responded to these letters and the parties met to discuss I.T.'s proposals. Since late 1984, however, S.I.U. has effectively ceased responding to I.T.'s offers to negotiate, and has submitted no bargaining proposals of its own. In the few meetings between S.I.U. and I.T. that have occurred since late 1984, the parties have discussed a variety of matters and restated their positions, but no meaningful contract negotiations have taken place.

## B. S.I.U.'s Demands

Key issues in this case are the strength and effect of S.I.U.'s commitment to its bargaining position; specifically, whether S.I.U. has conditioned meaningful bargaining on accession to its demands in such a way as to release I.T. from its duty to bargain. Thus, we must examine closely S.I.U.'s bargaining behavior.

For the purposes of this case, two demands have been paramount to S.I.U. First, S.I.U. has insisted that the bargaining unit be expanded. Instead of the historic, individual units, S.I.U. wants a single, "fleet-wide" unit combining all licensed and unlicensed employees at all ACBL Co.-affiliated companies.[2] Importantly, S.I.U. has also insisted that this expanded unit include employees at MAC, who have historically been represented by a different union. S.I.U. has doggedly pursued its demand for an expanded, MAC-inclusive unit throughout its dealings with I.T., refusing to enter into bargaining agreements within the historic units. *See, e.g., Board Decision,* slip op. at 3; *ACL I,* ALJ Decision at 5, 89–90, 99–100, 118, 127 & 130; *MAC Towing,* 262 N.L.R.B. at 1333–34. *See also Louisiana Dock Co., Inc. v. NLRB,* 909 F.2d 281, 284 (7th Cir.1990) (discussing a similar expanded-unit demand by S.I.U.). S.I.U. has never offered to enter into bargaining agreements in anything less than a fleet-wide, MAC-inclusive unit, repeating this demand at the last meeting held by parties before the onrush of the instant proceedings. *See* Transcript of Proceedings Before the N.L.R.B. on March 15, 1988 ("Tr.") at 124–27.

S.I.U. also pursued its demand for a fleet-wide, MAC-inclusive unit away from the bargaining table. In 1979, S.I.U. filed a "unit clarification" petition with the N.L.R.B., claiming that the Board should recognize this expanded unit. In *MAC Towing,* 262 N.L.R.B. 1331, the Board rejected this petition, finding that MAC constitutes an appropriate, separate unit, *id.* at 1334, and that S.I.U.'s attempt to merge-through-petition the historic, individual units was merely an attempt to "achieve by way of unit clarification what it has been unable to

---

1. Much of the history and evolution of these companies and bargaining units is discussed in *American Commercial Lines, Inc.,* 291 N.L.R.B. No. 143, slip op. at 3–5 (1988) ("*ACL I*"), a Board decision which is currently pending on petitions for review in this court, Nos. 88–3452, 89–1201 & 89–1521. *See also MAC Towing, Inc.,* 262 N.L.R.B. 1331, 1331–33 (1982).

2. At the time S.I.U. first made its fleet-wide unit demand, I.T.'s Canal Division had a single agreement covering all unit employees, and I.T.'s River Division, as well as the other ACBL Co.-affiliated companies, had separate agreements for their licensed and unlicensed units. Since I.T.'s corporate restructuring, three units have been recognized: one in I.T.'s Canal Division, and two (licensed and unlicensed) in I.T.'s River Division. *See ACL I,* slip op. at 5 n. 7.

achieve at the bargaining table." *Id.* at 1335.[3]

After losing before the Board in *MAC Towing,* S.I.U., while it held fast to its refusal to enter into any new contracts encompassing the individual units, did indicate a begrudging willingness to continue to meet with I.T. and discuss certain issues—particularly S.I.U.'s other demands and I.T.'s proposed changes in wages or other employment conditions. For example, in an August, 1983 letter in which S.I.U. pressed I.T. to capitulate to various of its demands, S.I.U. allowed that the "bargaining unit employees" concerning whom S.I.U. had requested information

> are those employees of Inland Tugs Co. in the bargaining units found by the NLRB to be the recognized bargaining units in *MAC Towing,* 262 [N.L.R.B. 1332]. By making its request for information regarding employees in these units, the SIU does not in any way waive its right to take all legal steps or appeals with regard to the unit question before the NLRB and the courts.... [T]he Union believes the Board's *MAC Towing* decision is erroneous and will take all proper legal action to have it reversed. In the meantime, the Union accepts recognition in the units found appropriate by the Board and demands that [I.T.] furnish it with the information requested....

Joint Exhibit 7. Similarly, in a December, 1983 meeting called by I.T. to discuss proposed changes in wages and other employment conditions, an S.I.U. representative stated,

> We look forward to receiving the Company proposals and hope that they show a willingness on the Company's part to make real improvements in the wages and working conditions of its employees.

By receiving the Company's proposals, by discussing them, and by making proposals of its own, the Union does not waive its legal position that the appropriate bargaining unit is that which we have urged before the [NLRB], namely, a unit including deck personnel, cooks, and engineering department employees in one unit together with employees of MAC Towing. Nevertheless, until such time as an appropriate Court has an opportunity to rule on the merits of the unit determination, the Union is willing to meet with Inland Tugs Company in the unit found appropriate by the NLRB.

As we have stated in the past, however, no meaningful negotiations or good faith bargaining can take place until the Company has remedied those unfair labor practices [charged in the various proceedings brought by S.I.U.].

Joint Exhibit 6.

S.I.U.'s other paramount demand has been that any successor contract must include a pledge by the ACBL Co.-affiliated companies to continue their contributions to certain S.I.U.-administered trust funds. The funds at issue provide employee benefits (e.g., pensions and health benefits), and support a training school, hiring hall and industry promotion fund. Although I.T. and the other companies had made these contributions under the collective bargaining agreements that expired at the end of 1979, they refused to continue them unless "various problems were remedied." *ACL I,* slip op. at 41. The companies argued (and I.T. argues here) that certain of the trust funds were illegal under section 302 of the Act, 29 U.S.C. § 186, and that I.T. could provide some of the same benefits provided by a few of the funds through I.T.-administered plans at substantially lower cost. *See, e.g., ACL I,* slip op. at 41 & 47–49, ALJ decision at 98–99, 106, 130–31.

---

**3.** S.I.U. sued in federal court to set aside the Board's order in *MAC Towing* as "arbitrary, capricious, and an abuse of discretion." The suit was dismissed. *Seafarer's Int'l Union of North America v. NLRB,* 114 L.R.R.M. (BNA) 3284 (D.D.C.1983) [available on WESTLAW at 1983 WL 2118]. The Board has since reaffirmed its holding in *MAC Towing. See ACL I,* slip op. at 4

n. 6 & 5 n. 7, ALJ Decision at 5–8. Undaunted, S.I.U. continues to contest the Board's holding(s) as to the proper size and scope of the bargaining units in its petition and argument before this court attacking *ACL I. American Barge Lines, Inc. v. NLRB,* Nos. 88–3452, 89–1201 & 89–1521.

S.I.U., however, has held firm to this demand. Throughout the 1979–1980 negotiations, S.I.U. "insisted on retaining the existing [trust fund] plans without modification," *id.*, slip op. at 41, repeatedly telling I.T., "No trust funds, no contract." Tr. at 141–42, 151–52. *See also ACL I,* ALJ Decision at 98 (S.I.U. representative "said there was no way the Union was going to sign a contract with [I.T.] or any company without the trust funds.") This position continued up through—and in part caused—the end of contract negotiations:

> [I.T.] arranged what was to be the parties' *final negotiation meeting on April 22, 1980.* During that meeting, at which a Federal mediator was present, the Union [S.I.U.] insisted that without [I.T.]'s agreement to contribute to the union trust funds there would be no contract. [I.T.] did not yield.

*Id.*, slip op. at 49. *See also id.,* ALJ Decision at 130; *American Commercial Barge Lines Co. v. Seafarer's Atlantic District,* 730 F.2d 327 (5th Cir.1984) (suit by the ACBL Co.-affiliated companies against S.I.U. for S.I.U.'s bargaining tactics and strike activities concerning the trust fund issue). Further, in the few meetings that have taken place since 1980, S.I.U. has repeated its demand that no contract(s) can issue without the trust fund contributions. *See* Tr. at 142, 148–49 & 152; Joint Exhibits 5 ¶ 1 & 7 ¶ 7.

## C. I.T.'s Challenged Actions

S.I.U. filed the unfair labor practice charge that has led to this case in response to two actions by I.T. in 1987. The first challenged action involves the method in which I.T.'s employees were paid. The work on I.T.'s boats fluctuates; employees ordinarily ride the boats for one month and then take one-half month off. Some of I.T.'s employees told I.T. that they wanted to have their paychecks spread out so that they could receive a (smaller) check every week, including off-weeks. In response to these employee requests, I.T. sent out ballots to its employees in July, 1987, and took a vote on this proposal. The unit employees approved the spread-out pay plan by a margin of 244 to 101. The pay plan was implemented January 1, 1988.

S.I.U. challenged this poll, which was conducted without prior notice to the union. We note that the only issue here is whether the act of soliciting employee views was a "direct dealing" violation; the method and outcome of the poll are not at issue, nor are the implementation and maintenance of the pay program.

The second challenged action involves I.T.'s transportation policy. I.T. has historically paid the costs of transporting its employees from their home cities to the launching sites of the boats on which they are working, and from the boats' termination points back to their homes. Thus, the parties' last (now long-expired) collective bargaining agreement provided that I.T. "shall reimburse each employee for expenses incurred in traveling between his home and the vessel when relieving or being relieved. Employees shall use economy fare air transportation, if available." Joint Exhibit 4. In the agreement, I.T. also pledged to compensate employees who use their own cars to get to the boats, and to reimburse crew members for other "out-of-pocket" travel expenses upon the presentation of receipts. *Id.* The agreement was silent as to modes of travel. *See Board Decision,* slip op. at 5 (rejecting the ALJ's finding that the agreement "mandates air travel"). In fact, the record shows that both the modes of travel and the methods of payment for travel expenses changed several times between 1979 and 1987. I.T. did not notify or bargain with S.I.U. concerning any of these changes.[4]

I.T. made a similar change in its travel policy in 1987. Pursuant to its five-year-old endeavor to move away from costlier air travel toward ground transportation, I.T. sent unit employees a memo in August, 1987, regarding travel expenses. The

---

4. There is some evidence that S.I.U. filed an earlier unfair labor practice charge concerning I.T.'s failure to notify S.I.U. before instituting prepaid airline tickets in late 1980. S.I.U. alleged there, as here, that the change in travel policy was an unlawful unilateral action. The charge appears to have been dismissed by the Board without even an ALJ hearing.

memo advised, "Due to the spiraling costs of airline travel we are going to have to look at alternative means of transportation, including buses, trains, vans, and personal vehicles." General Counsel Exhibit 3 ¶ 1. The memo also advised that bus and train fares would now be reimbursed instead of paid-in-advance, and that employees were "encouraged" to use their private vehicles. (I.T. sent a follow-up memo to its employees in October, thanking them for their "cooperation and forbearance" regarding the move toward ground transportation, and informing them that they would be eligible for compensation for travel-time hours in excess of "acceptable transit time" (six hours). General Counsel Exhibit 4 ¶¶ 1 & 2.)

S.I.U. charged that by taking the action reflected in these memos without prior notice to or bargaining with S.I.U., I.T. unilaterally implemented new travel practices in violation of its duty to bargain.

D. Proceedings Below

The instant unfair labor practice charge was heard before Administrative Law Judge ("ALJ") Claude R. Wolfe in the summer of 1988. ALJ Wolfe held that I.T. had violated its duty to bargain when it "bypassed the Union and dealt directly with employees by polling them regarding [the spread-out pay plan]," and when it modified its travel policy without notifying S.I.U., a "unilateral change in terms and conditions of employment." *Board Decision,* ALJ Decision at 3–9. Relying heavily on the findings of ALJ Thomas D. Johnston in *ACL I,* 291 N.L.R.B. No. 143, ALJ Wolfe rejected various of I.T.'s defenses, including the arguments that S.I.U. had unlawfully insisted to impasse on an expansion of the bargaining unit and/or on the trust fund contributions, and that S.I.U. had engaged in a course of bad faith bargaining. *See Board Decision,* ALJ Decision at 9–15. Specifically, ALJ Wolfe noted that ALJ Johnston had found in *ACL I* that I.T. itself had engaged in bad faith bargaining, which "negated the asserted defense of impasse." *Id.* at 10. ALJ Wolfe also held, in the alternative, that impasse on the trust funds or size of the unit could not save I.T.

even if it was found to exist: I.T. could not in any case change the unrelated travel policy without first offering the change to S.I.U., and the existence of impasse was irrelevant to the direct dealing charge, because that charge did not involve unilateral action but "impermissible evasion" of the duty to bargain. *Id.* at 10. Further, ALJ Wolfe rejected out of hand I.T.'s challenges that S.I.U. had engaged in bad faith bargaining over the trust fund contributions and/or the expanded unit, because he viewed such challenges as mere exceptions to or attacks on ALJ Johnston's findings in *ACL I. Id.*

Both parties filed exceptions to ALJ Wolfe's decision with the Board. In the interim, the N.L.R.B. reviewed and substantially reversed ALJ Johnston's decision in *ACL I. See* 291 N.L.R.B. No. 143, slip op. at 6–7. The Board reversed ALJ Johnston's finding that I.T. had engaged in bad faith bargaining, finding instead that "the totality of [I.T.'s] conduct during negotiations [is] indicative of lawful hard bargaining." *Id.* at 35–43. The Board also found that "an impasse occurred when, on April 22, 1980, the Union insisted that unless [I.T.] agreed to contribute to the union trust funds, there would be no contract," and that, therefore, I.T. did not violate the Act by instituting its own pension plan. *Id.* at 49–51. As for S.I.U.'s conduct during the negotiations, the Board in *ACL I* had this to say:

> We specifically refer to the Union's statement on December 27 that there would be no economic counter-proposals made until the contractual language problems were worked out. Although the Union's conduct is not alleged to be unlawful, the position taken by the Union at the December 27 bargaining session (the last session before the expiration of the contracts) could only have hindered successful bargaining.

*Id.* at 43 n. 71.

In light of the Board's decision in *ACL I,* the Board in the instant case rejected that portion of ALJ Wolfe's decision that relied on ALJ Johnston's finding of bad faith bargaining by I.T. *Board Decision,* slip

op. at 2–3. The Board nonetheless agreed with ALJ Wolfe that I.T. violated the Act by "dealing directly with employees concerning its method of paying wages and by unilaterally altering practices with respect to employee travel." *Id.* at 2. The Board rejected I.T.'s impasse and bad faith bargaining defenses based substantially on the ALJ's alternative findings. *Id.* at 2–4. Specifically, the Board agreed with ALJ Wolfe that impasse, even if found, would be irrelevant to S.I.U.'s allegation regarding the employee poll, because that charge involves direct dealing. *Id.* at 3 n. 5. The Board also found that, although S.I.U. held fast and firm to its expanded bargaining unit and trust fund contributions positions, "it did not condition all bargaining on acquiescence to its position, and, in fact, engaged in protracted bargaining with [I.T.] for a contract to succeed the expired agreement, and met or otherwise communicated with [I.T.] when notified of proposed changes in employees' wages and terms and conditions of employment and other matters potentially affecting employees." *Id.* at 3. The Board based this finding in large part on a January, 1985 letter in which S.I.U. "requested to be kept advised of intended and implemented changes in employment conditions." Then, in a passage that appears to be meant to dispose of, among other things, I.T.'s impasse and bad faith bargaining defenses, the Board stated as follows:

> Therefore, we find that the Union's conduct does not constitute a waiver of its right to bargain with [I.T.], either in fact or by operation of law, and does not vitiate [I.T.]'s obligation to bargain with the Union rather than employees about changes in the payroll system and before implementation of the changes in travel procedures.

*Id.* at 4. The Board did not further discuss S.I.U.'s bargaining conduct or I.T.'s challenges thereto.

From this Board decision and order I.T. filed a timely petition for review in this court. The Board has cross-petitioned for enforcement of the order, and S.I.U. has intervened. We have jurisdiction over I.T.'s petition, and over the Board's cross-

petition, under § 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f).

## II

### A. Standard of Review

■ The core determinants in this case are the parties' bargaining behavior and the application of the Act's requirements thereto. The findings of fact made by the Board in the course of resolving these issues are conclusive if they are supported by substantial evidence in the record as a whole. 29 U.S.C. § 160(f); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Lapham–Hickey Steel Corp. v. NLRB*, 904 F.2d 1180, 1184 (7th Cir.1990). In determining whether the Board's findings are so supported, we examine the whole record, "including the evidence opposed to the Board's view from which conflicting inferences reasonably could be drawn." *NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1283 (7th Cir.1989). *See also NLRB v. Adam and Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir.1977).

More specifically, we have previously described the question of bargaining "impasse," a key issue in this case, as "an inquiry particularly amenable to the expertise of the Board as fact-finder." *Lapham–Hickey*, 904 F.2d at 1185 (quotations and citations omitted). As the D.C.Circuit has noted, however, "[t]o the extent that the Board interprets a past agreement or an impasse proposal ... and bases its findings on such interpretations, those findings are properly regarded as ultimate legal conclusions attached to the parties' words and conduct, and are not entitled to special deference." *The Idaho Statesman v. NLRB*, 836 F.2d 1396, 1401 (D.C.Cir.1988) (quotation and citations omitted). Finally, in applying all of these principles of review, we are mindful of "the Board's special function of applying the provisions of the Act to the complexities of industrial life." *Lapham–Hickey*, 904 F.2d at 1184 (citing *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963)).

This court does not review Board decisions merely to rubber-stamp them, however. Although our deference to the Board is substantial, we must be on guard not to substitute "judicial abdication for judicial review. It is imperative that the reviewing court examine all of the evidence in context to ensure that the Board's findings fairly and accurately represent the picture painted by the record." *NLRB v. Harvstone Mfg. Co.*, 785 F.2d 570, 574–75 (7th Cir. 1986) (quotation and citations omitted).[5]

### B. Analysis

The Act endows both employers and unions with a duty to bargain collectively and in good faith. *See* 29 U.S.C. §§ 158(a)(5), 158(b)(3) & 158(d). The meaning of this duty, however, "is not readily ascertainable, although hundreds of cases and exhaustive commentaries have undertaken the task." 1 C. Morris, *The Developing Labor Law* 553 (2d ed. 1983) (lengthy citation omitted). One of our most helpful attempts to flesh out this duty came in *Kankakee–Iroquois County Employers' Ass'n v. NLRB*, 825 F.2d 1091, 1094 (7th Cir.1987):

> Section [158(d) of the Act] requires that parties bargain with a real desire to come into agreement. The statute, however, does not compel either party to agree to a proposal or require the making of a concession. The Act does not encourage a party to engage in fruitless marathon discussions at the expense of frank statement and support of his position. Moreover, a party is entitled to stand firm on a position if he reasonably believes that it is fair and proper or that he has sufficient bargaining strength to force agreement by the other party. A refusal to bargain cannot be equated with refusal to recede from an announced position advanced and maintained in good faith. However, this court has previously held that an adherence to unrealistically harsh positions throughout the bargaining process and an avoidance of any discussion of key

economic issues constitutes a failure to bargain in good faith.

> (Quoting and citing, *inter alia*, *NLRB v. Insurance Agents' Int'l Union*, 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960); *NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1951); *NLRB v. Wright Motors, Inc.*, 603 F.2d 604, 610 (7th Cir.1979).)

As this passage suggests, both the union and the employer can bargain in the best of faith, and yet be unable to reach agreement on important issues; just so long as neither side displays an implacable commitment to its demands, totally blocking negotiations. This distinction between lawful "hard bargaining" and unlawful "bad-faith" or "surface" bargaining, though far from crystalline (*see, e.g., Eltec Corp.*, 286 N.L.R.B. 890, 893–97 (1987)), is quite important, as unions and employers not infrequently reach deadlocks in bargaining. The rights and obligations that result from such deadlocks depend upon not only the bargaining behavior of the parties, but also the nature of the issue(s) involved.

For example, certain bargaining deadlocks are characterized in the cases as "impasses," a term-of-art (when used carefully) that describes situations in which "good faith bargaining has not resolved a key issue and ... there are no definite plans for further efforts to break the deadlock." *Lapham–Hickey*, 904 F.2d at 1185 (quotation and citations omitted). *See also Taft Broadcasting Co.*, 163 N.L.R.B. 475, 478 (1967) (seminal discussion of impasse). In the event of impasse, the employer is permitted to make unilateral changes in conditions of employment, but only as to matters that have been previously offered to the union. *See Louisiana Dock Co.*, 909 F.2d at 288 (citing *Huck Mfg. Co. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir.1982)); *Lapham–Hickey*, 904 F.2d at 1185 (citing *Richmond Recording Corp. v. NLRB*, 836 F.2d 289, 293 (7th Cir.1987)).

---

**5.** We note as well that Board findings as to impasse can be and have been set aside or modified on review. *See, e.g., National Fresh Fruit & Vegetable Co. v. NLRB*, 565 F.2d 1331 (5th Cir.1978).

As suggested above, the nature of the issue(s) involved can short-circuit this analysis, however. Since the Supreme Court's decision in *NLRB v. Wooster Div. of Borg–Warner Corp.*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), the courts and the Board have recognized a distinction between "mandatory" subjects of bargaining (i.e., wages, hours and other terms and conditions of employment), and non-mandatory or "permissive" subjects of bargaining (just about everything else).[6] Also since *Borg–Warner*, the courts and the Board have held that neither a union nor an employer is permitted to force a bargaining deadlock over the inclusion of a term covering a permissive subject of bargaining. Rather than a good faith "impasse," such a deadlock is an unfair labor practice by the offending party. *See, e.g., Louisiana Dock*, 909 F.2d at 286; *Boise Cascade Corp. v. NLRB*, 860 F.2d 471, 474 n. 9, 474–75 & 477 (D.C.Cir.1988); *National Fresh Fruit*, 565 F.2d at 1334.

■ This unfair labor practice, which can be found regardless of the "good" or "bad" faith of the offending party, *see Borg–Warner*, 356 U.S. at 349, 78 S.Ct. at 722, suspends the other party's bargaining duty: "[T]he innocent party need not negotiate as long as the bargaining is forestalled by the illegal demand." *General Drivers and Helpers Union, Local No. 554 v. Young and Hay Transp. Co.*, 522 F.2d 562, 566 (8th Cir.1975), *quoted in, Louisiana Dock*, 909 F.2d at 286. *Cf. Nassau Ins. Co.*, 280 N.L.R.B. 878, 891–92 (ALJ Decision) (1980); *Midwestern Instrument, Inc.*, 133 N.L.R.B. 1132, 1141 (ALJ Decision) (1961). The suspension of the "innocent" party's duty to bargain also releases it from its "derivative duty to refrain from implementing unilateral changes with respect to [even mandatory] subjects [of bargaining]. In other words, if [a union] unlawfully condition[s] future bargaining, [the employer is] free to implement unilateral changes with respect to *any* mandato-

ry bargaining subjects." *Louisiana Dock*, 909 F.2d at 286–87 (emphasis in original).

■ The Board freed itself from the task of applying these principles to this case by finding that S.I.U. had not conditioned negotiations on its expanded bargaining unit demand and/or on its trust fund contributions demand. In fact, despite the then-five-year hiatus in contract negotiations, the Board was not even willing to accept that a deadlock had occurred, holding instead that S.I.U. had "engaged in protracted bargaining with [I.T.] for a contract to succeed the expired agreement." *Board Decision*, slip op. at 3. The record evidence as a whole reveals that this finding cannot withstand review.

S.I.U. has repeatedly made it clear that no contracts will issue unless and until I.T. accepts the fleet-wide bargaining unit and pledges to continue contributing to all the union trust funds (the two primary "contractual language problems" mentioned by the Board in *ACL I* as S.I.U.'s hold-out positions. *See supra* at 1305.) True, I.T. has continued to submit some of its proposed changes in employment conditions to S.I.U., and S.I.U. has sporadically indicated that it likes that practice and wants it to continue (e.g., the January, 1985 letter relied upon by the Board). I.T. has also kept S.I.U. abreast of other matters, such as changes in its corporate structure. At no time since 1984, however—well before the I.T. actions that gave birth to this proceeding—have the parties meaningfully discussed or exchanged proposals concerning the successor contract or its terms. Moreover, even before 1984, although the parties traded positions, S.I.U. steadfastly held to its "No trust funds, no contract" demand, and a similar stance regarding its fleet-wide unit demand (although, regarding the latter, the Board's outright rejection of that position forced S.I.U. to temper somewhat—though never withdraw, *see su-*

---

6. The mandatory-permissive distinction has led to extensive case law and commentary. For a taste, *see* 1 C. Morris, *The Developing Labor Law* chs. 16, 17 & 18 (2d ed. 1983). Happily, we

need not venture deeply into that thicket here; as we discuss below, the proper labels for the issues involved in the instant case are fairly well established.

*pra* at 1303—the demand).[7] After the better part of a decade of such behavior, I.T. was entitled to take S.I.U. at its word.

■ S.I.U.'s demands have clearly caused a deadlock in the bargaining of any successor agreements between S.I.U. and I.T.; but how to characterize this deadlock and the issues that have caused it? Assuming that the parties have otherwise bargained in good faith, it could be that they have reached a "double impasse" as to S.I.U.'s two demands. (Indeed, in *ACL I* the Board held that these parties were at impasse as to the trust fund contributions. *See supra* at 1305.) Turning to the issues involved, however, we see that good faith impasse cannot be found here. Yes, S.I.U. could create a good faith impasse as to its demand for continued contributions to those trust funds that involved employee health and pension benefits, as such benefits are mandatory subjects of bargaining. *E.g., Inland Steel Co. v. NLRB*, 170 F.2d 247, 250–51 (7th Cir.1948) (retirement and pension plans). But, as to those trust funds that supported industry promotion efforts, S.I.U. could not create an impasse, as employer contributions to such efforts are a permissive subject of bargaining. *NLRB v. Sheet Metal Workers Local 38*, 575 F.2d 394, 397–98 (2d Cir.1978); *American Thoro–Clean*, 283 N.L.R.B. 1107, 1109 (1987).

■ Moreover, it is clear that S.I.U. could not force an impasse as to the expanded bargaining unit demand, because a demand to change the size or scope of the bargaining unit does not concern a mandatory subject of bargaining. *Louisiana Dock Co.*, 909 F.2d at 286–89. In *Louisiana Dock*, we examined a very similar demand by this same union. Citing *The Idaho Statesman*, 836 F.2d at 1400, and

*Young & Hay*, 522 F.2d at 566,[8] we held that S.I.U. had engaged in "unlawful conduct" when it conditioned bargaining on the acceptance of its demand for a multi-location bargaining unit (rather than the historically recognized single-location units). We therefore reversed the Board's order that the employer violated its duty to bargain by instituting layoffs and reductions in salary without notifying S.I.U. *Louisiana Dock Co.*, 909 F.2d at 287–89. *See also Newspaper Printing Corp. v. NLRB*, 692 F.2d 615, 620 (6th Cir.1982) (scope of bargaining unit is not a mandatory subject, and thus insistence on modification of the unit violates the Act); *Newspaper Printing Corp. v. NLRB*, 625 F.2d 956, 963 (10th Cir.1980) (same), *cert. denied*, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981); *Standard Register Co.*, 288 N.L.R.B. No. 150 (1988) (same).

In this case, as in *Louisiana Dock*, the evidence establishes that, while it has shown some willingness to meet and discuss certain issues, S.I.U. has conditioned all meaningful bargaining over a successor agreement on I.T.'s concession to demands that involve permissive subjects of bargaining. By so doing, S.I.U. has violated the Act, and has released I.T. from its duty to bargain "as long as the bargaining is forestalled by the illegal demand[s]." *Young & Hay*, 522 F.2d at 566. Therefore, we decline to enforce that portion of the Board's order that finds violation in I.T.'s unilateral change in travel policy.

■ This does not end our inquiry, however. In the order at issue, the Board made two brief statements that counsel for the Board, on appeal, has treated as alternative holdings: 1) I.T. was not permitted in any event to make the change regarding the travel policy without first notifying

7. As we stated in *Wright Motors*, 603 F.2d at 610 n. 8, the fact that a party "carefully stated that it was not 'wedded to' any particular proposal will not exonerate it when its intransigent bargaining posture belies its words."

8. The Board distinguished *Young & Hay* on factual grounds. *Board Decision*, slip op. at 4 n. 6. Our review of the record in this case and the facts in *Young & Hay* convinces us that the latter cannot be so easily distinguished from the

former. The pattern of S.I.U.'s conduct is in fact quite similar to that of the union's conduct in *Young & Hay*. Indeed, in at least one sense S.I.U.'s conduct can be viewed as even more intransigent: the union's multi-location unit demand in *Young & Hay* only blocked negotiations for a matter of months, 522 F.2d at 567, while in the instant case S.I.U.'s demands have blocked negotiations for years.

S.I.U. because payment of travel expenses was a "mandatory subject[ ] of bargaining [that] bear[s] no relation to the expanded unit sought by the Union or to the Union's trust funds," *Board Decision*, slip op. at 4; and 2) as held by ALJ Wolfe, I.T.'s "impasse defense" is irrelevant to S.I.U.'s challenge to the employee poll because that charge deals not with a unilateral change but direct dealing. *Id.* at 3 n. 4. The first of these statements centers on the premise that impasse on one issue generally does not relieve an employer's duty to bargain as to other, unrelated issues. As sound as this premise may be, it is wholly inapplicable here. As we stated in rejecting a similar Board argument in *Louisiana Dock:*

> [I]n this case the parties did not reach an impasse, because the Union did not bargain in good faith. The Union's demand that all future negotiations be conditioned upon the Employer's acceptance of a single multi-location bargaining unit violated the Union's duty to negotiate in good faith under § 8(d) of the Act. *Associated General Contractors v. NLRB*, 637 F.2d 556, 559 (8th Cir.1980); *Oil, Chemical and Atomic Workers, Int'l Union, AFL–CIO v. NLRB*, 486 F.2d 1266, 1270 (D.C.Cir.1973). Since there were no good faith negotiations, the parties could not reach an impasse.... LA Dock is released from its duty to negotiate not by a good faith deadlock, but rather by the Union's unlawful conduct.

909 F.2d at 288. Thus, it matters not whether the travel policy was a mandatory subject of bargaining and/or whether it was unrelated to S.I.U.'s hold-out demands; I.T., like "LA Dock," was not released from further bargaining over certain subjects as a result of the existence of impasse, but was permitted to "implement unilateral changes with respect to *any* mandatory bargaining subjects," *Louisiana Dock*, 909 F.2d at 286–87, as a result of S.I.U.'s unlawful conduct.

In contrast, the fact that the employee poll involves direct dealing is quite impor-

tant. An employer's statutory duty to bargain collectively with its employees' representative is an exclusive one. 29 U.S.C. § 159(a). That is to say, the Act requires that the employer recognize that "the statutory representative is the one with whom it must deal in conducting bargaining negotiations, and that it can no longer bargain directly or indirectly with the employees." *General Elec. Co.*, 150 N.L.R.B. 192, 194 (1964), *enforced*, 418 F.2d 736 (2d Cir.1969). Thus, it is an established tenet of labor law that an employer violates its "negative duty to treat with no other [than the employees' chosen representative]" if it bargains or deals directly with employees. *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 684–88, 64 S.Ct. 830, 833–35, 88 L.Ed. 1007 (1944) (quoting *Labor Board v. Jones & Laughlin Corp.*, 301 U.S. 1, 44, 57 S.Ct. 615, 627, 81 L.Ed. 893 (1937)). *See also Gloversville Embossing Corp.*, 297 N.L.R.B. No. 21, ALJ Decision at 3–9 (1989); *Obie Pacific, Inc.*, 196 N.L.R.B. 458, 458–59 (1972). It is similarly well-established, as the Board's cavalier dismissal of I.T.'s "impasse defense" suggests, that the existence of impasse does not permit an employer to cease recognizing the union as the employees' exclusive representative. *See, e.g., NLRB v. Flex Plastics*, 726 F.2d 272, 275 (6th Cir.1984).

■ The issue here, however, is not the fate of I.T.'s well-established "negative duty" in the face of a good faith impasse; as we hold above, S.I.U. has engaged in unlawful conduct that precludes a finding of impasse. The issue is whether S.I.U.'s conduct, which suspends I.T.'s duty to bargain and its derivative duty to refrain from making unilateral changes, *Louisiana Dock*, 909 F.2d at 286–87, also suspends I.T.'s duty to refrain from dealing directly with its employees. As to this issue, the Board has offered us no assistance; neither in its one-sentence footnote on this point (*see Board Decision* at 3 n. 4) nor in the brief or oral argument of its counsel before this court.[9] I.T., for its part, argues

---

9. The failure by the Board and its counsel to discuss this issue is even more striking in light of the fact that I.T.'s challenge to S.I.U.'s bar-

gaining conduct has from the very beginning been much more that a mere "impasse defense." From the time of the hearing before ALJ Wolfe,

that S.I.U.'s unlawful bargaining behavior has "rendered bargaining futile in its entirety and prevented good faith bargaining from ever getting started."

Were it that I.T.'s duty to respect S.I.U. as its employees' exclusive representative was, like I.T.'s duty to refrain from unilateral actions, solely derivative of its duty to bargain in good faith over working conditions, it, too, might be suspended by S.I.U.'s unlawful conduct. The exclusive-dealing duty, however, also finds its source in the Act's guarantee that employees have the right to join together and choose their own representative free from employer interference, and that once chosen that representative must be honored by the employer as the employees' exclusive agent for collective bargaining. *See* 29 U.S.C. §§ 157, 158(a)(1) & 159. More generally, as indicated by the substantial body of law as to when (not often) and how (very carefully) an employer can withdraw recognition from a union (*see, e.g., Brooks v. NLRB,* 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); *Bolton–Emerson, Inc. v. NLRB,* 899 F.2d 104 (1st Cir.1990)), the law looks quite unfavorably on an employer's attempt to circumvent its employees' chosen representative. And with good reason: if employers were permitted in all but a very limited set of circumstances to "go behind the designated representatives [and] bargain with the employees themselves, prior to [a proper] revocation [by the employees of their designation]," *Medo Photo Supply,* 321 U.S. at 685, 64 S.Ct. at 833, the entire representation and collective bargaining scheme established by the Act would be substantially undermined. *Id.* at 684–85, 64 S.Ct. at 833–34. *See also Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 220, 97 S.Ct. 1782, 1791–92, 52 L.Ed.2d 261 (1977) ("The principle of exclusive union representation, which underlies the National Labor Relations Act ..., is a central element in the congressional structuring of industrial relations.") (footnote and citations omitted);

*J.I. Case Co. v. Labor Board,* 321 U.S. 332, 338–39, 64 S.Ct. 576, 580–81, 88 L.Ed. 762 (1944).

I.T.'s argument here would have us allow an employer to circumvent entirely its employees' chosen representative solely because of that representative's unlawful intransigence at the bargaining table. In none of the cases cited by I.T. has a court or the N.L.R.B. so held,[10] and we are unwilling to do so here. We therefore grant enforcement to that portion of the Board's order that found I.T.'s direct dealing with its employees to be a violation of the Act and granted remedies for this violation.

### III

The Board found that I.T. violated its duty to bargain in good faith by unilaterally changing its travel policy and by dealing directly with its employees regarding its method of paying wages. This order is based in large part on the conclusion that S.I.U. had not itself engaged in bargaining conduct that violated the Act, a conclusion which fails to find adequate support in the record. On the contrary, the record evidence, and the application thereto of established precedent, reveal that I.T.'s duty to refrain from making the challenged unilateral change in travel policy was suspended by S.I.U.'s unlawful conduct. Because its roots go deeper, however, I.T.'s duty to refrain from direct dealing was not suspended by S.I.U.'s unlawful conduct. Accordingly, both I.T.'s PETITION FOR REVIEW, and the Board's CROSS-PETITION FOR ENFORCEMENT, are GRANTED IN PART and DENIED IN PART.

---

I.T. has argued that it was relieved from its duty to bargain as to all mandatory subjects by the fact that S.I.U. unlawfully bargained to deadlock over non-mandatory subjects. *See* Tr. at 134–37.

**10.** Those cases include *NLRB v. Indiana & Michigan Elec. Co.,* 599 F.2d 185 (7th Cir.1979); and *Midwestern Instrument, Inc.,* 133 N.L.R.B. 1132.