## BOARD OF EDUCATION OF REGION 16 *v.* STATE BOARD OF LABOR RELATIONS ET AL.
### (SC 18347)

Rogers, C. J., and Norcott, Palmer, McLachlan, Eveleigh and Vertefeuille, Js.

64

Argued September 8, 2010—officially released November 16, 2010

*William R. Connon*, with whom, on the brief, was *Brooke H. Sherer*, for the appellant (plaintiff).

*Alexandra M. Gross*, for the appellee (named defendant).

*Ronald Cordilico*, for the appellee (defendant Region 16 Education Association).

*Kelly B. Moyher* filed a brief for the Connecticut Association of Boards of Education as amicus curiae.

*Opinion*

ROGERS, C. J. The central issue in this case is whether an increase in the workload of certain teachers during the course of a school year constituted a unilateral change of a condition of employment under this state's collective bargaining law. The plaintiff, the board of education of Region 16, appeals[1] from the judgment of the trial court dismissing its appeal from the decision of the named defendant, the state board of labor relations (board), in which the board concluded that the plaintiff had violated General Statutes § 10-153e (b) when it unilaterally changed a condition of employment.[2] Specifically, the board concluded that the

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 10-153e (b) provides: "The local or regional board of education or its representatives or agents are prohibited from: (1) Interfering, restraining or coercing certified professional employees in the exercise of the rights guaranteed in sections 10-153a to 10-153n; (2) dominating or interfering with the formation, existence or administration of any employees' bargaining agent or representative; (3) discharging or otherwise discriminating against or for any certified professional employee because such employee has signed or filed any affidavit, petition or complaint under said sections; (4) refusing to negotiate in good faith with the employees' bargaining agent or representative which has been designated or elected as the exclusive representative in an appropriate unit in accordance with the provisions of said sections; or (5) refusing to participate in good faith in mediation or arbitration. A prohibited practice committed by a board of education, its representatives or agents shall not be a defense to an illegal strike or concerted refusal to render services."

plaintiff acted unlawfully when it unilaterally and substantially increased the workload of certain employees who were members of the defendant Region 16 Education Association (union). In addition, the board concluded that the plaintiff had engaged in unlawful direct dealing with the employees.

The plaintiff claims that the trial court improperly: (1) upheld the board's conclusion that the union was not required to prove that there was a unit wide employment practice in order to establish a prima facie case of a unilateral change; (2) concluded that the board's determination that the union had established a prima facie case of a unilateral change of a definite and fixed employment practice was supported by substantial evidence; and (3) concluded that the board's ruling that the plaintiff had engaged in unlawful direct dealing with the employees was supported by substantial evidence. We conclude that the board's finding that the plaintiff had unilaterally and substantially changed a definite and fixed employment practice was not supported by substantial evidence and, therefore, we reverse the portion of the trial court's judgment relating to that issue.[3] We agree with the trial court, however, that the board's ruling that the plaintiff had engaged in unlawful direct dealing was supported by substantial evidence. Accordingly, we affirm the judgment to the extent that it upheld the board's conclusion that the plaintiff had engaged

[3] Accordingly, we need not reach the plaintiff's first claim that the trial court improperly upheld the board's conclusion that the union was not required to establish a unit wide employment practice. Likewise, we need not reach the plaintiff's subordinate claims that, if this court concludes that the trial court properly concluded that the board properly determined that the union had established a prima facie case of unilateral change, the trial court improperly determined that: (1) the board properly had rejected the plaintiff's defenses; (2) the board properly had excluded certain evidence from the hearing; and (3) the board's decision did not violate state and federal special education law and federal law governing the privacy of student educational records.

in direct dealing and ordered the plaintiff to cease and desist from such conduct.

The board found the following relevant facts. The plaintiff operates a high school known as Woodland High School (high school). The plaintiff also operates one middle school and three elementary schools. All of the schools provide both regular and special education programs. The length of the work year and work day of all teachers in the schools operated by the plaintiff is specified in the collective bargaining agreement (agreement) between the plaintiff and the union. The agreement also provides that "[t]eachers are expected to be available for student help, parent conferences, faculty meetings, general staff department or group meetings, committee work, and other activities of a professional nature before and after regular school hours."[4]

At the beginning of the 2004–2005 school year, the high school had five special education teachers, including four "skills lab" teachers, each of whom was responsible for teaching a specific number of special education students, known as the teacher's "caseload," and one

[4] Article 9 of the agreement provides in relevant part: "A. Commencing with the 2001–02 school year, the standard teacher workday is seven hours [and] fifteen . . . minutes, including the required time stated in [s]ection B of this article. The teacher [work year] shall be . . . 186 . . . days and will include two professional development . . . days and at least one . . . non-student day in addition to the student year. At the [plaintiff's] option, a second semester parent-teacher conference day . . . may be converted into a third professional day.

"B. All teachers will be expected to be on duty before the opening of school and closing of school long enough to plan and fulfill their individual responsibilities. Under normal circumstances, all teachers should be in their assigned buildings fifteen . . . minutes before the scheduled beginning of the student day and shall remain thirty . . . minutes after the scheduled end of the student day. Teachers are expected to be available for student help, parent conferences, faculty meetings, general staff department or group meetings, committee work, and other activities of a professional nature before and after regular school hours. . . ."

transition coordinator, who was responsible for placing students in jobs in the community. The skills lab teachers were Arthur Richardson, Deborah Flaherty, Tracy Brunelle and Melissa Dean, and the transition coordinator was Jessica Veneziano. Richardson's caseload was approximately seventeen students; Flaherty's caseload was ten students; Brunelle's caseload was sixteen students; and Dean's caseload was fifteen students. No students were specifically assigned to Veneziano.

In October, 2004, Richardson resigned from his teaching position at the high school. The plaintiff attempted to find a replacement for him, but, because of a shortage of special education teachers in the state, was unable to do so. Marna Murtha, the plaintiff's director of pupil personnel and the person in charge of the plaintiff's department of special education, met several times with the skills lab teachers and Veneziano to discuss the best way to service Richardson's former students. Ultimately, they decided to divide Richardson's caseload among the skills lab teachers. In addition, Veneziano took on several of Richardson's students. As a result, Flaherty's caseload increased from ten to fourteen students and her work hours increased by approximately fourteen hours per week; Brunelle's caseload increased from sixteen to twenty-one students and her work hours increased by approximately ten hours per week; and Dean's caseload increased from fifteen to twenty-one students and her work hours increased by approximately ten hours per week.[5] From the 2001–2002 school year through the 2005–2006 school year, special education teachers at the high school, middle school and elementary schools operated by the plaintiff had caseloads ranging from four to twenty-two students.

---

[5] Dean testified that her caseload increased to twenty-one students, but the plaintiff presented documentary evidence that her caseload increased to twenty-two students.

In January, 2005, the plaintiff hired a permanent, full-time substitute teacher to replace Richardson for the remainder of the school year. The substitute was not certified as a special education teacher, but had a "durational shortage area permit" authorizing him to teach special education students on a temporary basis.[6] After the substitute was hired, Murtha met with the skills lab teachers and Veneziano (special education teachers), and they decided that the substitute teacher would teach the self-contained history class, which had been one of Richardson's duties. Because they were "not comfortable" with allowing the substitute to take on Richardson's other duties, however, the four special education teachers retained his caseload. At either the initial meeting or at another meeting, Murtha suggested that the special education teachers use the looping method employed by the middle school, in which teachers are assigned to students in a single grade level and move with the students when they progress to the next grade level. The union was not informed of the meetings at which these decisions were made. It was Murtha's standard practice when school employees left employment unexpectedly to attempt to hire replacements and to collaborate with the remaining staff, but not the union, to allocate the former employee's workload among the staff.

At some point after Richardson's departure, the special education teachers approached Murtha and complained that their workloads were too heavy. They did not ask Murtha directly for an increase in their compensation, but they asked the union to request an increase on their behalf. Thereafter, in late March, 2005, Murtha

---

[6] When there is a severe shortage of qualified candidates for a teaching position, the state department of education may issue a special durational shortage area permit that allows individuals without full certification to teach for up to forty days. During the 2004–2005 school year, school districts were permitted to apply for an extension of that period if no qualified teacher could be found.

approached Brunelle and stated that the special education teachers should not proceed with "their complaint" because there was no point in pursuing it. Murtha also left a voicemail message for Brunelle in which she asked Brunelle to meet with the other special education teachers and to send a letter to Marguerite Shook, the plaintiff's superintendent of schools, stating that the union president, Catherine Mirabilio, had approached them regarding the complaint, not the reverse, and that they were not seeking a stipend for their increased workload. Brunelle responded by leaving a voicemail message for Murtha in which she stated that Mirabilio had not approached the special education teachers, but they had approached Mirabilio, and that they would not be sending a letter to Shook. Brunelle also forwarded Murtha's voicemail message to Mirabilio.

Thereafter, the union filed a complaint with the board alleging that the plaintiff had "unilaterally and substantially increased the case management workload of [the] special education teachers without notification and without negotiating with the [union]." After an evidentiary hearing, the board rendered a decision in which it concluded that the union had "demonstrated a fixed and definite practice among [the] special education teachers and a significant departure from that practice [and] . . . has established a prima facie case of unlawful unilateral change substantial enough to require bargaining." The board rejected the plaintiff's arguments that, because the caseload of special education teachers both at the high school and throughout the school district historically had fluctuated over the course of the school year as students were placed in or removed from the special education program, the union had failed to establish that the increased workload after Richardson's departure constituted an unlawful unilateral change. The board concluded that the former "sort of variation is anticipated by . . . teachers and thus per-

mits them to plan for the natural ebb and flow of students in their caseload. Richardson's absence, however, created an unexpected, sudden and fixed swelling in each [special education] teacher's caseload that lasted from the time of Richardson's departure in or about October of 2004 through the end of the school year in June 2005." The board also concluded that the plaintiff had engaged in unlawful direct dealing with the special education teachers. Accordingly, the board ordered the plaintiff to cease and desist from "[i]ncreasing the workload of the special education teachers without negotiating with the [u]nion" and from "[d]ealing directly with employees concerning mandatory subjects of bargaining."

Thereafter, the plaintiff appealed from the board's decision to the trial court. After a hearing, the trial court determined that the board properly had concluded that the plaintiff had unilaterally and substantially changed a fixed and definite employment practice and had engaged in unlawful direct dealing with the special education teachers. Accordingly, it dismissed the plaintiff's appeal. This appeal followed.[7]

I

We first address the plaintiff's claim that the trial court improperly concluded that the board's decision that the plaintiff unilaterally and substantially changed a fixed and definite employment practice when it reassigned Richardson's caseload to the other special education teachers was supported by substantial evidence. Specifically, the plaintiff claims that, because the union failed to present evidence either that the caseloads handled by the special education teachers or the hours that they worked per week were substantially greater after

---

[7] After this appeal was filed, the court granted the application of the Connecticut Association of Boards of Education to file an amicus curiae brief in support of the plaintiff's appeal.

Richardson's departure than in the preceding school years, the union failed to establish a fixed and definite prior practice. We agree.

At the outset, we set forth the standard of review. "[R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 833, 955 A.2d 15 (2008). "An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . ." (Internal quotation marks omitted.) Id., 833–34. "It is fundamental that a plaintiff has the burden of proving that the [agency], on the facts before [it], acted contrary to law and in abuse of [its] discretion . . . . The law is also well established that if the decision of the commissioner is reasonably supported by the evidence it must be sustained." (Internal quotation marks omitted.) Id., 834.

We next review the law governing unilateral changes to employment conditions. Under § 10-153e (b) (4), regional boards of education are prohibited from "refusing to negotiate in good faith with the employees' bargaining agent or representative which has been

designated or elected as the exclusive representative in an appropriate unit in accordance with the provisions of said sections . . . ." This court previously has recognized that a unilateral change to an employment condition constitutes an unlawful refusal to negotiate under the statute. *West Hartford Education Assn., Inc.* v. *DeCourcy*, 162 Conn. 566, 596, 295 A.2d 526 (1972) (employer who unilaterally changes working conditions "is refusing to bargain in fact with the employee organization"); see also *In re Dept. of Motor Vehicles*, Conn. Board of Labor Relations Decision No. 3806 (January 29, 2001) p. 4 ("[a]n employer's unilateral change in a major term or condition of employment which involves a mandatory subject of bargaining will constitute a refusal to bargain and a prohibited practice under [§ 10-153e (b) (4)] unless the employer proves an adequate defense"); *In re Portland Board of Education*, Conn. Board of Labor Relations Decision No. 1670 (August 15, 1978) p. 3 (unilateral change in major condition of employment is subject to mandatory bargaining).[8] To establish a unilateral change of a condition of employment, the union must establish that the employment practice was "clearly enunciated and consistent, [that it] *endure*[*d*] *over a reasonable length of time*, and [that it was] an accepted practice by both parties." (Emphasis in original; internal quotation marks omitted.) *Honulik* v. *Greenwich*, 293 Conn. 698, 719 n.33, 980 A.2d 880 (2009); see also *In re Dept. of Motor Vehicles*, supra, Conn. Board of Labor Relations Decision No. 3806, p.

---

[8] Although this court has had little occasion to address the standards that apply in determining whether a union has established a violation of labor law under the unilateral change doctrine, the board has applied the doctrine in many cases over many years. The parties disagree as to how the standards that the board has adopted apply to the facts of this case, but neither the plaintiff nor the union contends that the standards themselves are unreasonable. Accordingly, we defer to the board's interpretation of the law. *Vincent* v. *New Haven*, 285 Conn. 778, 784 n.8, 941 A.2d 932 (2008) (when agency's interpretation of statute is both reasonable and time-tested, it is entitled to deference by this court).

6 ("[t]here is no question that [in order to constitute a condition of employment] the practice must be definite and fixed, rather than isolated and sporadic").

"However, not all unilateral changes made by an employer constitute a refusal to bargain, such as when the change does not amount to a substantial change in a major term or condition . . . or when the change solely concerns a matter fundamental to the operation of the public agency and falls within the realm of sole managerial discretion . . . or where the collective bargaining agreement gives express or implied consent to the type of unilateral action involved." (Citations omitted.) *In re Naugatuck*, Conn. Board of Labor Relations Decision No. 2874 (December 27, 1990) p. 4; see also *West Hartford Education Assn., Inc.* v. *DeCourcy*, supra, 162 Conn. 580 (number of hours per day that teachers are required to be in attendance at school and number of days in school year during which teachers may be assigned to duties are matters of educational policy that are reserved to board of education and are not subject to mandatory negotiation);[9] *In re Bloomfield*

***

[9] Because we conclude that the board's determination that the plaintiff had unilaterally changed a condition of employment was not supported by substantial evidence, we need not address the thorny questions of whether the reallocation of Richardson's caseload to the special education teachers was in the plaintiff's sole discretion and, if so, whether a substantial increase in their workload as the result of the reallocation would, nevertheless, be subject to mandatory negotiation. See *West Hartford Education Assn., Inc.* v. *DeCourcy*, supra, 162 Conn. 586–87 (although "board of education alone is empowered to determine whether there shall be extracurricular activities and what such activities shall be . . . assignment of teachers to such activities and the question of compensation for such extracurricular activities [are] mandatory subjects of negotiation"); *In re Bloomfield Board of Education*, Conn. Board of Labor Relations Decision No. 3130 (August 10, 1993) p. 7 (although employer is not required to negotiate "concerning any elimination [of a position] that entails transfer of duties to the remaining employees" and "it is the sole province of management to determine how many employees to retain to perform the functions selected by its policy-makers . . . when employees are laid off and the remaining unit employees perform the residual work, the collective bargaining process . . . is protected because at the point where the added [workload] becomes substantial, the employer must

*Board of Education,* Conn. Board of Labor Relations Decision No. 2821 (July 3, 1990) p. 6 ("[i]f a change is de minimis or insubstantial in its impact upon a major term or condition of employment, [the board] will decline to find [that] a prohibited practice has occurred"). "[T]he burden is on the union as complainant to prove that there has in fact been a practice and that it has in fact been changed." *In re Enfield Board of Education,* Conn. Board of Labor Relations Decision No. 2580 (September 1, 1987) p. 5.

With these principles in mind, we address the plaintiff's claim that, because the union presented no evidence of a preexisting, fixed and definite practice concerning the special education teachers' workload, there was no basis for the board's finding that the increase in the number of hours that the special education teachers worked per week after Richardson's departure constituted a unilateral change. We agree. Although the union presented evidence that the weekly work hours of three of the special education teachers had increased by ten to fourteen hours after Richardson's departure, there was no evidence that the increased number of hours was substantially greater than the number of hours per week that they had worked *in previous school years.* Indeed, the only evidence regarding the workload of the special education teachers in prior years established that, from the 2001–2002 school year through the 2003–2004 school year,

bargain with the [u]nion over the [workload] increases"); *In re Bloomfield Board of Education,* Conn. Board of Labor Relations Decision No. 2821 (July 3, 1990) p. 7 ("boards of education have the right to determine educational policy and unilaterally implement such policy decisions, but where this implementation impinges in some substantial way upon a major term or condition of employment, there arises a duty to bargain the impact"); *In re New Canaan Board of Education,* Conn. Board of Labor Relations Decision No. 2400 (June 4, 1985) p. 4 (although, under *DeCourcy,* length of school day and school year are not subject to negotiation, additional compensation for increase in school day or school year is subject to negotiation).

the caseload of three of the special education teachers had ranged from five special education students per teacher to twenty-one students.[10] This caseload was not substantially lower than the caseload of the special education teachers after Richardson's departure, which ranged from "several" students for Veneziano to twenty-one students for Brunelle and Dean. Moreover, even if we were to assume that the average caseload per special education teacher was somewhat greater after Richardson's departure than in previous years,[11] that would not necessarily mean that the average workload was greater. The students could have had fewer needs or, as the plaintiff pointed out to the trial court, the teachers could simply have spent less time servicing each student, within the parameters set by state and federal

[10] The board found that "[b]etween 2001 and 2006, special education teachers throughout Region 16 were responsible for anywhere from four to twenty-two students at any given time." In support of this finding, the board relied on a spreadsheet that the plaintiff had introduced into evidence. It is clear, therefore, that the board accepted the accuracy of that spreadsheet. Accordingly, although the board in its findings of fact did not specifically address the range of caseloads *before* Richardson's departure in October, 2004, which is the relevant time period for purposes of determining whether the union established a fixed and uniform employment practice, and did not focus exclusively on the range of caseloads managed by high school special education teachers, even though it ultimately determined that the practices of special education teachers in other schools were not relevant to its analysis, this court may rely on the spreadsheet to make that determination. As we have indicated, we assume, without deciding, that, in determining whether the union had established a fixed and definite employment practice, the board properly limited its consideration to high school special education teachers.

[11] The plaintiff contends that the evidence established that, in the 2002–2003 school year, the four special education teachers were responsible for sixty-four students. It further contends that, after Richardson's departure, those four teachers were responsible for only fifty-eight students. Accordingly, the plaintiff contends that the average caseload of the special education teachers after Richardson's departure was less than in previous years. Although the defendants do not expressly dispute this contention, because the evidence on this question is not entirely clear, we decline to resolve this factual dispute. See *Wellswood Columbia, LLC* v. *Hebron*, 295 Conn. 802, 808 n.7, 992 A.2d 1120 (2010).

special education law and the school board's educational policy.[12]

It is clear, therefore, that the baseline that the board used to determine whether there had been a unilateral change to an employment condition was the number of hours that the special education teachers had worked per week in the weeks immediately preceding Richardson's departure in October, 2004.[13] The union has provided no authority, however, for the proposition that, when an employment practice has been in place for years, the board can ignore the historic practice and consider a practice that has been in place for only a matter of weeks in determining whether there has been a substantial change from the practice. Indeed, the board's decisions support a contrary conclusion. See *In re East Hartford*, Conn. Board of Labor Relations Decision No. 2212 (May 27, 1983) p. 3 (when employer

[12] We emphasize that the evidence amply supported the board's finding that the special education teachers had worked an additional ten to fourteen hours per week after Richardson's departure than they had in the immediately preceding weeks. In addition, the evidence shows that these teachers willingly and professionally performed the additional work so as to ensure that the needs of the special education students were met. What the evidence does not show is that the special education teachers performed substantially more hours of work per week after Richardson's departure than they had in previous school years.

[13] The union suggested at oral argument before this court that it was implicit, in the special education teachers' testimony that their weekly workload had increased by ten to fourteen hours after Richardson's departure, that the immediately preceding workload had existed over an extended period of time. In its brief to this court, however, the board states that it considered "the length of time [that] the working conditions of . . . [the] special education teachers had existed, which the [p]laintiff argued was not long enough to have created a past practice. The . . . [b]oard rejected this argument; although the length of time a condition has existed is a factor in the analysis, a relatively short existence is not fatal to a claim of unlawful unilateral change in a past practice." Thus, the board appears to concede that it compared the number of hours that the special education teachers worked per week after Richardson's departure to the number of hours the teachers had worked per week immediately before Richardson's departure, rather than to the number of hours that they had worked in previous school years.

provided uniform benefit for approximately one year, benefit constituted condition of employment for purposes of unilateral change doctrine); *In re Portland Board of Education*, supra, Conn. Board of Labor Relations Decision No. 1670, pp. 3–4 (when employer had instituted requirement that teachers assume corridor duty five years prior to complaint, practice constituted condition of employment for purposes of unilateral change doctrine); *In re Dept. of Corrections*, Conn. Board of Labor Relations Decision No. 2729 (April 28, 1989) p. 4 (although some employees occasionally reported to work in civilian clothes during seven years prior to complaint, practice did not constitute condition of employment for purposes of unilateral change doctrine); *In re Dept. of Public Safety State Police*, Conn. Board of Labor Relations Decision No. 2761 (September 12, 1989) p. 5 (employer's occasional denial of leave requests during four years preceding complaint contradicted union's claim that granting of all leave requests was condition of employment for purposes of unilateral change doctrine). Accordingly, we conclude that, in the absence of any evidence establishing the hours that the special education teachers worked per week in the school years preceding Richardson's departure, the board's finding that three of them had been required to work ten to fourteen more hours per week after Richardson's departure than immediately before it was not sufficient to support its conclusion that the plaintiff had unilaterally changed a fixed and definite employment practice.

To the extent that the board claims that the evidence established that the plaintiff unilaterally changed a fixed and definite practice of not substantially increasing the work hours of the special education teachers suddenly during the school year, we are not persuaded.[14] As we

[14] The board concluded that the increase in the weekly work hours after Richardson's departure was different from "the typical variation in caseload in any given year caused by students entering and exiting the special educa-

have indicated, to establish a unilateral change of workload, the union must present evidence both that the employees' workload after the change was substantially greater than before it and that the preceding workload had "endure[d] over a reasonable length of time, and [that it was] an accepted practice by both parties." (Internal quotation marks omitted.) *Honulik* v. *Greenwich*, supra, 293 Conn. 719 n.33. Although we recognize that a sudden, unanticipated and substantial increase in workload may cause significant difficulties for an employee in the short term,[15] the defendants have provided no authority for the proposition that, if an increased workload was not a substantial departure from a fixed and definite prior practice, the increase nevertheless can constitute an unlawful unilateral change because of its timing, or the fact that it was unanticipated.[16] We conclude in the present case that the evidence was insufficient to establish that the workload of the special education teachers immediately

---

tion program" because Richardson's departure "created an *unexpected, sudden* and fixed swelling in each [special education] teacher's caseload that lasted from the time of [his] departure . . . through the end of the school year . . . ." (Emphasis added.) The board also concluded that "the *surprise* increase in each [special education] teacher's caseload [constituted] a substantial impact on their workload." (Emphasis added.)

[15] For example, if the workload of school employees in a particular school year were substantially lower than in preceding years, and the employees had reason to believe that the workload would remain constant over the course of the year, they might order their personal affairs, such as child care, carpooling, recreational activities and other such matters, accordingly. A sudden increase in workload to the historic level could disrupt these plans and cause significant inconvenience or expense to the employees. A sudden increase could also cause a temporary surge in workload above historic levels as the teachers attempted to get up to speed. These impacts would not, however, constitute a unilateral change to a fixed and definite employment practice.

[16] Moreover, in the present case, the board found as a factual matter that, when an employee of the plaintiff leaves unexpectedly during the school year and a substitute either cannot be found or cannot take on all of the former employee's duties, the plaintiff's ordinary practice is to allocate the former employee's duties among the remaining employees.

before Richardson's departure was a fixed and definite employment practice. We conclude, therefore, that the trial court improperly determined that the board's determination that the plaintiff had unilaterally changed an employment condition in violation of § 10-153e (b) was supported by substantial evidence.

II

We next address the plaintiff's claim that the trial court improperly concluded that the board's decision that the plaintiff had engaged in unlawful direct dealing was supported by substantial evidence. We disagree.

This court previously has recognized that, because "Connecticut statutes dealing with labor relations have been closely patterned after the National Labor Relations Act [codified at 29 U.S.C. § 151 et seq.]"; *West Hartford Education Assn., Inc.* v. *DeCourcy*, supra, 162 Conn. 578; the federal statute "is of great assistance and persuasive force in the interpretation of our own acts."[17] Id., 579. "The National Labor Relations Act [act] makes it an employer's duty to bargain collectively with the chosen representatives of [its] employees, and since this obligation is exclusive, it exacts the negative duty to treat with no other. . . . After a duly authorized collective bargaining representative has been selected, the employer cannot negotiate wages or other terms of employment with individual workers. . . . Thus, an employer interferes with his employees' right to bargain

[17] None of the parties has identified the specific provision of state law that prohibits employers from negotiating directly with employees who have chosen a bargaining representative. We presume, however, that the board found that direct dealing with school employees violates § 10-153e (b) (1), which prohibits regional boards of education from "[i]nterfering, restraining or coercing certified professional employees in the exercise of the rights guaranteed in sections 10-153a to 10-153n . . . ." See *In re New London, Conn.:* Board of Labor Relations Decision No. 4187 (October 3, 2006) pp. 1, 4 (direct dealing violates General Statutes § 7-470, which governs municipal employers and is substantially similar to § 10-153e).

collectively . . . when he treats directly with employees and grants them a wage increase in return for their promise to repudiate the union which they have designated as their representative. . . . The statutory obligation thus imposed is to deal with the employees through the union rather than dealing with the union through the employees. Attempts to bypass the representative may be considered evidence of bad faith in the duty to bargain. . . . The act does not prohibit an employer from communicating in noncoercive terms with [its] employees while collective negotiations are in progress. . . . The element of negotiation is critical. Another crucial factor in these cases is whether or not the communication is designed to undermine and denigrate the union." (Citations omitted.) Id., 592–93. Although "[a]n employer may speak freely to its employees about a wide range of issues including the status of negotiations, outstanding offers, its position, the reasons for its position, and objectively supportable, reasonable beliefs concerning future events . . . [it] cannot act in a coercive manner by making separate promises of benefits or threatening employees. Thus the employer may freely communicate with employees in noncoercive terms, as long as those communications do not contain some sort of express or implied quid pro quo offer that is not before the union." (Citations omitted.) *Americare Pine Lodge Nursing & Rehabilitation Center* v. *National Labor Relations Board*, 164 F.3d 867, 875 (4th Cir. 1999); see also *Service Employees International Union, AFL-CIO, Local 509* v. *Labor Relations Commission*, 431 Mass. 710, 717, 729 N.E.2d 1100 (2000) ("[a]n employer's communication with its employees is direct dealing if its purpose or effect is the erosion of the [u]nion's status as exclusive bargaining representative" [internal quotation marks omitted]); *Crete Education Assn.* v. *Saline County School District No. 76-0002*, 265 Neb. 8, 22, 654 N.W.2d 166 (2002)

(elements of direct dealing are "[1] [t]he employer was communicating directly with union-represented employees; [2] the discussion was for the purpose of establishing wages, hours, and terms and conditions of employment or undercutting the collective bargaining unit's role in bargaining; and [3] such communication was made to the exclusion of the collective bargaining unit").

In the present case, the board concluded that, when Murtha met with the special education teachers to discuss the best way to handle Richardson's caseload after his departure and ultimately decided, in collaboration with the special education teachers, that the caseload would be divided among them, her conduct constituted unlawful direct dealing. The trial court concluded that the board's determination was supported by substantial evidence and, in addition, found that, when Murtha urged the special education teachers not to pursue their complaint to the union, that conduct also constituted unlawful direct dealing.

We have concluded that the evidence did not support the board's conclusion that the increase in the special education teachers' workload constituted a substantial change to a fixed and definite employment practice. It necessarily follows that the evidence was insufficient to support the board's conclusion that Murtha's initial meetings with the special education teachers and her collaboration with them on the question of how best to reallocate Richardson's caseload constituted unlawful direct dealing with the teachers on a subject of mandatory negotiation. We conclude, however, that, after she became aware that the union intended to file a complaint to the board on the teachers' behalf, Murtha's suggestion to Brunelle that the special education teachers withdraw the complaint and her request that they write a letter to Shook stating that they had not approached the union and that they were not seeking

a stipend for the additional workload constituted direct dealing.[18] Although Murtha did not expressly offer a quid pro quo, she implied that the special education teachers would be better off if they did not pursue their formal complaint with the union. At the very least, her dealings with Brunelle clearly were intended to influence the special education teachers on a matter in which the union was representing them and, thus, to undermine the union's role as the teachers' exclusive bargaining representative.[19] See *West Hartford Education Assn., Inc.* v. *DeCourcy*, supra, 162 Conn. 592–93; see also *Mattina* v. *Ardsley Bus Corp.*, United States District Court, Docket No. 10 Civ. 2474 (LTS) (S.D.N.Y. May 12, 2010) (when agent of employer solicited concessionary letters from employees on matter that was subject of pending union grievance, employer engaged in unlawful direct dealing); *Warwick* v. *Pennsylvania Labor Relations Board*, 671 A.2d 1199, 1201 n.4 (Pa. Commw.) ("Among the specific obligations contained within the general mandate to collectively bargain is the duty to process grievances with—but only with— the employee representative. . . . This exclusive duty follows the general rule that where there is a majority representative, the employer is guilty of an unfair labor practice when it engages in direct dealing with its

---

[18] We would reach this conclusion even if we were to assume Murtha actually believed that the union had approached the teachers, and not the reverse, and that the teachers were not seeking a stipend for the additional workload. Once the union became involved in the dispute, the plaintiff was required to deal exclusively with it and not with the teachers.

[19] Although the board did not expressly conclude that this conduct by Murtha constituted unlawful direct dealing with the teachers, it expressly found that she had engaged in the conduct. It would elevate form over substance to conclude that the board's determination that the plaintiff had engaged in unlawful direct dealing was not supported by substantial evidence merely because, in its analysis of the claim, the board did not expressly refer to this particular conduct, which was a clearer case of direct dealing than the conduct to which it did expressly refer. Cf. *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 588, 628 A.2d 1286 (1993) (this court has held in certain contexts that it is improper for reviewing court to reverse agency decision simply because agency failed to state reason for decision on record).

employees rather than through the majority representative." [Citations omitted.]), appeal denied, 545 Pa. 666, 681 A.2d 180 (1996). Even though the union ultimately could not prevail on its claim that the increased workload was subject to mandatory negotiation because it failed to establish that the plaintiff had substantially changed a fixed and definite employment practice, once the teachers had invoked their right under the collective bargaining agreement to have the union represent them in connection with the claim, the plaintiff could no longer deal with the teachers directly on the matter. We conclude, therefore, that the trial court properly concluded that the board's conclusion that the plaintiff had engaged in unlawful direct dealing was supported by substantial evidence.

The judgment is reversed with respect to the trial court's dismissal of the plaintiff's claim challenging the board's ruling that the plaintiff had unilaterally changed a condition of employment in violation of § 10-153e (b), and the case is remanded to the trial court with direction to render judgment sustaining the plaintiff's appeal on that issue; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.